THE KANSAS CENTRAL RAILWAY COMPANY v. WILLIAM A. ALLEN.

1. ART. 9, CH. 23 OF GEN. STAT., *Construed.* Railway companies, by virtue of their compulsory powers to take land, under article 9, chapter 23 of General Statutes, and amendments thereto, acquire no absolute title in fee simple in the lands condemned, but only the right to the perpetual use of the property for railroad purposes.

2. ———— *Title of Land-Owner.* The former proprietor of the soil still retains the fee of the land, and his right for every purpose not incompatible with the rights of the railroad company.

3. ———— *Rights of Railroad Company, and of Land-Owner.* As a matter of law, the railroad company has the paramount right to the land, and the land-owner must yield to the superior claim secured by the condemnation proceedings; and he cannot, in any mode or for any purpose, interfere with the use of the property so taken for railroad purposes. Whether the necessities of the railroad require exclusive occupancy of the land, is a question of fact and not of law.

*Error from Jefferson District Court.*

IN June, 1877, the *Kansas Central Railway Company* made written application to the judge of the district court of Jack-

son county for the appointment of commissioners to make the appraisement and assessment of damages of a right of way for its road through that county. The commissioners were appointed, and subsequently made and filed their report in the office of the county clerk. The line of the proposed route for the railroad was through the S. E. $\frac{1}{4}$ and the E. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$ of section 25, township 6, range 14, being the lands of *William A. Allen.* The land appropriated for the right of way was one hundred feet in width, and the damages were assessed at $220.75. From this assessment of damages, *Allen* appealed to the district court of Jackson county. Upon motion of the plaintiff in error, a change of venue was granted, and the case was ordered to be tried in Jefferson county. The case was heard at the June Term, 1877, of the district court. The jury assessed the damage of the defendant in error at $500, and judgment was rendered accordingly for that sum in his favor. The *Railway Company* brings the case here for review.

*E. Stillings,* and *Keeler & Gephart,* for plaintiff in error:

The main and most important question in this case and that of the railway company against Ireland, is the extent of the right acquired by a railway company in the strip of land taken for a highway by compulsory proceedings through occupied and improved farms. The instruction complained of in the case of Ireland goes to the extent of forbidding the farmer and his stock from passing from one part of his farm to the other *under* the railroad, in the bed of a stream, so deep below the railroad bridge that loaded teams could readily pass under the bridge, without any kind of obstruction to the railway. The same point is substantially before the court in the Allen case, for in that case, the bridge of the railroad was so high in places as to allow the free passage of stock, and with but little preparation to allow a roadway so far below the railway, as to be no kind of obstruction to it. Has our legislature given or intended to give any such monopoly and arbitrary right to railway companies?

If so, it is time it should be known; for we think we may safely assert the proposition, that if the uniform custom from the commencement of the railway construction in this state to the present time can throw any light upon the question, or tend to give construction to the statute, the instructions given in these cases are not the law of the state. In the case of Allen, the proof showed that he was and had been in the use of the very privilege which this instruction required the jury to give him damages for being deprived of.

The statute gives the railway company the perpetual right to the strip of land for the use of the railroad. (Dassler's Stat., p. 174, § 84.) Wherever the railway passes through an inclosure, the company must make cattle-guards where the road enters and where it leaves the inclosure. (Laws 1869, ch. 81, § 1.) The inclosure is thus kept an entirety the same as before; and yet we are told by this instruction that it is the right of the railway company to exclude the occupant and his stock from passing under or over the road, without regard to the question whether such crossing may be effected without detriment to the use of the ground for a railway. Suppose the banks were high enough for a bridge to be made across which would be no obstruction to the use of the land for the railway, would it not be an unreasonable construction to put on the right given by the statute to say that the company could forbid such crossing? The case in 32 Vt., p. 43, has been and will probably be relied on to support the instruction, but that case was decided, so far as it affected the question of farm-crossing, on a statute of that state, and it is no way in point to support the instruction asked and given in these cases.

The authorities are agreed on one proposition, which is, that while the right of eminent domain gives the company the power to take what may be necessary for the making and operation of its railway, the power extends no further. (Redfield on Railways, vol. 1, p. 250; *Gusy v. Rld. Co.*, 4 Ohio St. 323, 324, 325.) That it was not necessary to take from the farmer the right to cross the railroad track from one part

of the farm to the other, is shown by the fact that, either by statute or custom, this right has always been exercised by farmers throughout the civilized world. That the company could not prohibit the owner of the farm from passing under the railroad with teams, stock, etc., there can be no doubt. (*Parley v. Chandler,* 6 Mass. 455, 456; 2 Smith's Leading Cases, 258, marg. pp. 212, 213; Washburn on Easements, 253, marg. p. 196.)

The court erred in refusing to allow the jury to be conducted to the premises, and to have a view thereof. The section of the code providing for a review by the jury, is particularly applicable to such cases as these. It was inconvenient (as these cases were tried in another county), but such inconvenience should not deprive a party of such benefit.

*John S. Hopkins,* and *Louis A. Myers,* for defendant in error:

In the opinion of the court below, it was unnecessary for the jury to have a view of the property which was the subject of the litigation, and improper, for a reason by him known, to allow the jury to depart from the county of Jefferson, and travel fifty or sixty miles to Jackson county, to view pieces of land, the market value of which alone was in issue, and could be known only by those acquainted with the value of the lands.

Under § 84 of ch. 23 of the Laws of 1868, the railway company (plaintiff in error), obtains the perpetual use of the strip of land condemned. Under §1 of ch. 105, Laws of 1876, it is the duty of each and every railway company within this state to construct and keep in repair at each crossing of any regularly laid out public highway, a good and substantial crossing; and it is not obliged to construct a crossing, only at such a place or point. Under §1 of ch. 81 of the Laws of 1869, it is declared that when any railroad runs through any improved or fenced land, said railroad company shall make proper cattle-guards on such railroad where it enters and where it leaves such improved or fenced land; and the railroad company is not compelled to make cattle-

·guards between such points. The statutes of this state do not declare it to be the duty of a railroad company to fence the right of way taken and appropriated; but that it may do so cannot be questioned, and the right to do so is contemplated by § 5, ch. 94, Laws of 1874. (16 Kas. 573; 18 Kas. 462.)

The statutes of the state do not declare where or when the railway company must, if ever, construct crossings for the ·convenience of the defendant in error. The defendant in ·error might choose to have them constructed now, and in places to suit his convenience, while the plaintiff in error might choose to have them constructed at some future time, and at a point convenient to itself. Who is to settle the dispute? The commissioners appointed by the court to assess the damages to the lands of the defendant in error, had no .authority to locate a crossing (had they attempted such a thing), or even to say that one should be constructed. The statutes give them no such authority.

The provisions of the general statutes of the various states giving the power to exercise the right of eminent domain, are quite similar, and the rights acquired thereby, as well as the extent of the same, would be similar under the various statutes. The statutes of Vermont are similar in this respect to the statutes of this state. (Gen. Stat. Vt. 1870, p. 219, § 17.) The section declares that three commissioners shall determine the damages which the owner of the land may have sustained, or shall be likely to sustain, by the occupation of the railway. The statute of Kansas (Gen. Stat., ch. 23, § 84) reads, that the perpetual use of the land condemned for railway purposes shall vest in the railway company, its successors and assigns.

The decisions made by the supreme court of Vermont upon the provisions of said section of their statutes, will be authority in these cases and in this court. In the case of *Jackson v. R. & B. Rld. Co.*, 25 Vt., 150, the court uses this language: "It is not pretended that the taking of the land for a highway gives the public anything more than a right

19—22 KAS.

of way in the land. But the right of a railway company to
the exclusive possession of the land taken, differs very essen-
tially from that of the public in the land taken for a com-
mon highway. The railway company must, from the very
nature of its operations, for the security of its passengers,
workmen, and the employment of the road, have the right
at all times to the exclusive occupancy of the land taken,
and to exclude all concurrent occupancy by the former owners
in any mode and for any purpose."

A railway company may maintain trespass for all unlaw-
ful entries and acts upon the land taken by it for railroad
purposes whenever such entries and acts interfere with the
exclusive possession of such land. (32 Vt. 43.) Driving a
team upon or across the track or strip of land condemned,
except at a public highway, would be a trespass. (42 Vt. 265.)
Stock straying upon the track or strip of land taken for rail-
way purposes, where the same is not inclosed with a lawful
fence, would be trespassing; but the railway company could
not take any advantage of the fact of such trespass in an ac-
tion brought to recover the value of the stock killed by the
passing trains of the railway company. (See cases before cited;
also, 16 Kas. 573; 18 id. 462; 5 id. 167.)

The plaintiff in error has purchased the strips of lands in
question, of the defendant in error. It must pay for them
the full value of the land appropriated. It must pay for the
damages to that not appropriated, irrespective of any pro-
posed benefits to that unappropriated. (Const. of Kansas,
art. 12, § 4; 8 Kas. 149; 9 id. 145; 17 id. 246.) The plaintiff
in error having paid the full value of the property taken for
corporate purposes, it should be vested with the whole inter-
est of the land. (34 N. H. 285.) The right of perpetual use
requires for its enjoyment a use of the land permanent in its
nature and practically exclusive: 2 Gray (Mass.), 580. The
legislature of Kansas has declared, to secure the safety of the
many passing trains and their millions of passengers, just the
places where the people (and the defendant in error) shall pass
and drive teams and stock across railway grounds. Those

places or crossings are at the regularly laid out public high-
ways. (Laws 1876, ch. 105, §§ 1, 2.)

The opinion of the court was delivered by

HORTON, C. J.: The errors alleged are, that the court re-
fused to allow the jury to be conducted to and have a view
of the premises appropriated for the route of the railroad,
and that the jury were misdirected in a material point of
law.

In regard to the first allegation of error, it is sufficient to
say that the matter of viewing the premises is left by the
statute to the discretion of the court. Section 227 of the
code provides:

"Whenever, in the opinion of the court, it is proper for
the jury to have a view of the property which is the subject
of litigation,  .  .  .  it may order them to be conducted
in a body, under the charge of an officer, to the place, which
shall be shown to them by some person appointed by the
court for that purpose."

In this case the court did not think it necessary for the
jury to view the premises, and owing to the great incon-
venience attending such a view, both in regard to the long
distance the jury would have been compelled to travel and
the great delay involved in the disposition of the cause in the
trial court, by the absence of the jury in another county, we
perceive no abuse of discretion on the part of the court in
this action. The direction complained of is as follows:

"Now as to the right of the company and the plaintiff to
the strip of land taken and appropriated by the company:
After the strip of land is appropriated, the exclusive use of
this strip vests in the company. No legal right or privilege
to cross over or under it is reserved or left to the plaintiff.
The company has a perfect right to fence up its road, ex-
cept at public highways or public crossings. In this respect
the right of the company differs materially from the rights
of the public in land taken for a common highway. The
railway company, the defendant, must, from the very nature
of its operations, for the security of its trains, its passengers
and its employés, and its free use of its road, have the right

at all times to the exclusive occupancy of the land taken, and to exclude all concurrent occupancy by the plaintiff in any mode and for any purpose."

From the record it is shown that the plaintiff testified:

"That the farm was worth twenty dollars per acre before the construction of the railroad across it, and fifteen dollars per acre after its construction. He also testified that there were two drains crossed by the road on his land, one near the easterly entrance to the land, and one near the center of the land; that the railroad company had filled up the eastern one, and made a trestle-work over the one near the center; that the one near the center of the farm was deep enough below the railroad trestle-work for stock to pass under the road, by making a little expenditure, but that the railroad company had not prepared it for such purpose, nor given him any right of way under or over said road; that the road cut off a part of his farm from Elk creek, and left him without access to it for his stock from the main part of his farm; that he had crossed the road with his teams and hauled a part of his crop across it the present season, and stacked it on the south side of the railroad near the creek, and that the railroad company never gave him any right or privilege to cross the road under or over the road."

Other witnesses were called as to the damages, who gave their opinions — some of them much above that of the plaintiff, and some of them much below it; and upon the testimony so given, it became a question of importance, as affecting the damages to be assessed, whether, under the appropriation made, as shown by this proceeding, the railway company had the right to the exclusive possession of the right of way appropriated, and to prevent the owner of the farm from passing under or over the said railroad with his teams or his stock.

To decide the question involved, it becomes necessary to determine the nature and extent of the interest which railroad companies acquire in lands obtained by condemnation proceedings, under the law of 1868 and the amendments of 1870. Sec. 84, ch. 23, Laws of 1868, provides that the perpetual use of the land condemned shall vest in the railroad company to which it is

1. Art. 9, ch. 23, Gen. Stat., construed.

appropriated for the use of the railroad. The law of 1864 provided that a title in fee simple might be acquired by railroad companies by virtue of their compulsory powers in taking land. Under the law of 1868, a mere easement only is granted; under the old law of 1864, an absolute title could be secured. Some reason must have existed in the minds of the law-makers for the change which has been made in the statute, and we have no right to extend by judicial construction an easement into an absolute title. There is a wide difference between the two. Under an absolute title in fee simple, the owner of the soil owns from the center of the earth up to the sky.

An easement merely gives to a railroad company a right of way in the land; that is, the right to use the land for its purposes. This includes the right to employ the land taken for the purposes of constructing, maintaining and operating a railroad thereon. Under this right, the company has the free and perfect use of the surface of the land, so far as necessary for all its purposes, and the right to use as much above and below the surface as may be needed. This would include the right to tunnel the land, to cut embankments, to grade and make road-beds, to operate and maintain a railroad with one or more lines of track, with proper stations, depots, turn-outs, and all other appurtenances of a railroad. The former proprietor of the soil still retains the fee of the

2. Title of land-owner. land and his right to the land for every purpose not incompatible with the rights of the railroad company. Upon the discontinuance or abandonment of the right of way, the entire and exclusive property and right of enjoyment revest in the proprietor of the soil. After the condemnation and payment of damages, the soil and freehold belong to the owner of the land, subject to the

3. Rights of the railroad company, and of the land-owner. easement or incumbrance, and such land-owner has the right to the use of the condemned property, provided such use does not interfere with the use of the property for railroad purposes. In some cases, the right of the owner of the soil would practically not amount

to anything, because the purposes of a railroad company might require the use of all the land taken to such a degree as to forbid the owner from any benefit whatever. The paramount right is with the railroad company, and the land-owner can do nothing which will interfere with the safety of its road, appurtenances, trains, passengers, or workmen.

With these views of the interest which railroad companies acquire in lands obtained by condemnation proceedings, it is evident that the court erred in instructing the jury that "no legal right or privilege to cross over or under [the railroad] is reserved or left to the plaintiff," (defendant in error.)   Under this instruction, the land-owner could not erect a suspension bridge over the road, or float in a balloon over it in the air; or even dig coal, or mine minerals, or quarry rock, in the bowels of the earth beneath the road-bed.   The law is otherwise.   After the strip of land was appropriated to the plaintiff in error, the perpetual use of the land vested in the railway company, its successors and assigns, for railroad purposes.   The defendant in error had no legal right or privilege to cross over or under the road so as to interfere with the use of the property for those purposes.   The company had a perfect right to fence up its road, except at public highways or public crossings.   In the use of the land, the railroad company had the paramount right, but the defendant in error had also the right to the land for every purpose not incompatible with the rights of the road.   If the railroad company required exclusive occupancy of the land taken for the use of its railroad on account of the nature of its operations, or for the security of its trains, its passengers or its employés, it was entitled to such occupancy.   On the other hand, if the company had built its bridges and trestle-work so high in places as to allow the free passage of stock or teams under the road, and their entry and passage were of no detriment to the railroad, and in no way interfered with the use of the land for the purposes of the railroad, the defendant in error, as the land-owner, had the right to enter upon such land and pass under such

bridges or trestle-work with his teams and stock without being a trespasser. He had also the right to widen the drain or passage under the trestle-work, if this in no way interfered with the rights of the railway company. The trial court followed the authority of *Jackson v. Railroad Company*, 25 Vt. 150; but that is an exceptional case. It goes too far. It transfers an easement into an absolute title. It announces as a matter of law, that a railroad company has the right at all times to the exclusive occupancy of the land condemned for its purposes, and excludes all concurrent occupancy by the land-owner in any mode or for any purposes. We are unwilling to approve that doctrine. It is our opinion that it is a question of fact, not of law, whether the necessities of the railroad demand exclusive occupancy for its purposes, and what use of the property by the owner is a detriment to, or interference with the rights of the road. Again, this authority is in conflict with the majority of cases, and if adopted as the law in this state, now so sparsely settled, and where in many of the frontier counties but a single track is necessary, and public highways and public crossings are at great distances from each other, would work severe hardship and injustice. (*Blake v. Rich*, 34 N. H. 282; Washburn on Easements, 159, 214; *Lance's Appeal*, 55 Pa. St. 16; *Evans v. Haefner*, 29 Mo. 141; *Railroad Company v. Burkett*, 42 Ala. 83; 1 Redfield on Railways, 247; *Railroad Co. v. Kip*, 46 N. Y. 546; *Cemetery v. Railroad Company*, 68 N. Y. 591.)

The direction to the jury by the court below, inconsistent with this opinion, being erroneous, the judgment is reversed, and the cause remanded for new trial.

VALENTINE, J., concurring.

BREWER, J., not sitting.